UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON

CIVIL ACTION NO. 05-CV-599-KKC

WILLIAM HENRY CLAY                                                          PLAINTIFF

v.            **MEMORANDUM OPINION AND ORDER**

UNITED STATES OF AMERICA                                          DEFENDANT

Currently before the Court for consideration are the following pleadings:

(1)      The "Renewed Motion for Summary Judgment" [Record No. 41], filed by the

defendant, the United States of America;

(2)      The "Response" [Record No. 42] filed by William Henry Clay, the *pro se*

plaintiff ("Clay"), to the United States' "Motion to Dismiss"; and

(3)      The "Reply" [Record No. 44], filed by the United States of America.

PROCEDURAL HISTORY

Plaintiff William Henry Clay is now confined in the United States Prison located in

Atlanta, Georgia.  The events which give rise to this action occurred in 2003, when the plaintiff

was confined in the federal Correctional Institution located in Manchester, Kentucky.

In his original complaint, filed in October of 2005,  Clay asserted numerous claims.   He

alleged that various BOP officials had solicited his services as an inmate-undercover agent.

Specifically, Clay alleged that  the United States is liable under the Federal Tort Claims Act, 28

U.S.C. §§ 1346(b), 2671-2680 ("FTCA") because it did not meet its statutory duty under 18

U.S.C. § 4042 by failing to protect him, a federal inmate, from an intentional assault committed

by a Bureau of Prisons ("BOP") employee.

The United States filed two Motions to Dismiss [*See* Record Nos. 8 and 30] and Clay filed various responses to those motions.  On September 21, 2006, the Court entered a Memorandum Opinion and Order ("Opinion and Order") and Partial Summary Judgment [Record Nos. 32 and 33].[1]    In the Opinion and Order, the Court dismissed with prejudice all of Clay's claims asserted under 28 U.S.C. § 1331, under the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).   The Court allowed the FTCA claim to proceed past the summary judgment stage  [*Id*]   Because the Court determined that the record lacked information from the United States as to Clay's alleged role as an undercover informant for the BOP, the Court was unable to address certain aspects of the FTCA claim.[2]

<u>UNITED STATES' MOTION [Record No. 41]</u>
1. <u>Summary of United States' Legal Arguments</u>

In response to the Opinion and Order, the United States filed its third Motion for Summary Judgment [Record No. 41].  The United States contends that it did not breach its statutory duty under, 18 U.S.C. § 4042,  to care and protect Clay from harm by food service employee Morris Grundy.   Citing *Schindler v. United States*, 661 F.2d 552, 560 (6th Cir. 1981), the United States argues that in order to determine liability under § 4042, the elements of Kentucky state tort law must be applied.  According to the United States, Kentucky law provides

---

[1] In the Opinion and Order, the Court thoroughly discussed both the plaintiff's and the United States' version of the facts and both parties' respective legal arguments.  The Court will not recite the facts or claims here in any significant detail, as they are fully set forth in the Opinion and Order.

[2] The Court stated as follows:

"[t]he plaintiff's FTCA claims for breach of duty under §4042 will proceed forward for more development as to whether there were any mandatory procedures governing the safety of an inmate allegedly being used undercover to target a BOP employee for criminal activity."

[Record No. 32, Op. & Ord., p. 18].

2

that "ordinary care" must be taken to "prevent any foreseeable injury." *Watters v. TSR, Inc.*, 904
F.2d 378, 380 (6th Cir. 1990)(quoting *M & T Chemicals, Inc. v. Westrick*, 525 S.W.2d 740, 741
(Ky. 1974)).

 The United States frames the issue here as whether FCI-Manchester prison officials had
reasonable grounds to believe that Clay was in danger from Grundy and failed to protect him
from that danger.  Relying on *Bartlett v. Commonwealth of Kentucky*, 418 S.W.2d 225 (Ky.
1967), the United States argues that a prison custodian must exercise ordinary care for the
protection of his prisoner if there is reasonable ground to apprehend the danger to the prisoner.
The United States advances four arguments on this point.

 First, the United States argues that FCI-Manchester staff had no reasonable grounds upon
which to believe Clay was in danger from Grundy.  The United States alleges that an employee
stabbing an inmate is  highly unusual and unheard of in a prison setting. [Record No. 41-2, p.10].

 Second, the United States contends that FCI-Manchester staff had no reasonable grounds
upon which to believe Clay was in danger from Grundy because Clay specifically denied having
any fear of Grundy.  The United States alleges that Clay never communicated any apprehensions
about Grundy or made any requests to be protected from Grundy [*Id.*, pp. 10-11].

 Third, based upon Grundy and Clay's past conduct and reputations, the United States
claims that FCI-Manchester staff did not have any reasonable grounds upon which to believe
Clay was in danger from Grundy [*Id.*, p. 12].

 Fourth, the United States alleges that the investigating FBI agent did not have any
reasonable grounds upon which to believe Clay was in danger from Grundy.

 In support of these arguments, the United States attached the Declaration of Tammy

McKnight, a Special Investigative Services ("SIS") Technician at FCI-Manchester and Timothy Briggs an Agent with the Federal Bureau of Investigations ("FBI"). [3]  While Briggs provides supplemental insight into the relevant facts, the bulk of the United States' legal arguments are premised on the detailed allegations in McKnight's Declaration.

The United States concludes its Memorandum by arguing that any decision made herein as to protection of Clay was matter within the discretion of the BOP.  Accordingly, it cites several cases holding that any claim arising from the exercise of discretion is barred by the discretionary function exception to the FTCA, 28 U.S.C.A. 2680(a).

### 2. Tammy McKnight Declaration [Record No. 41-3]

In her Declaration, McKnight set forth a detailed accounting of her involvement, on behalf of the government, with Clay.  She states that in 2003, the SIS conducted an informal investigation of Morris Grundy, an FCI-Manchester staff member.  Grundy was alleged to be involved in dealing illegal drugs with Clay [McKnight Decl., ¶ 2].

On or about January 28, 2003, Clay approached Lieutenant Greenfield and alleged that Grundy was involved in dealing drugs with him and other inmates [*Id*]. SIS Lieutenant Howell, McKnight's supervisor, asked McKnight to talk to Clay and ask him if he would meet with the FBI and possibly wear a body recorder [*Id*. ¶ 3].

Clay informed McKnight that Grundy asked him to help convince other inmates not to speak about a previous incident involving him (Grundy) which could cost him (Grundy) his job. [*Id*., ¶ 4].  Clay said he agreed, but wanted something in return. [*Id*.]. Clay said Grundy agreed to

---

[3]  The SIS department is responsible for investigating disciplinary violations and possible wrongdoing by inmates and staff members.

4

bring in drugs for him and other inmates.

McKnight claims that Clay said he would consider cooperating with the FBI and wearing a body recorder.  On February 6, 2003, McKnight sat in on a meeting with FBI Agent Tim Briggs and Clay [*Id*., ¶ 5].  McKnight states that during this conversation, Clay expressed some concerns of being pressured by the other inmates involved in the drug deal, but said he had not been specifically threatened by anyone. [*Id*.].  McKnight states in her Declaration that "At no time did Clay voice any fear of harm by Grundy." [*Id*.].  McKnight states that she specifically asked Clay if he needed to be placed in protective custody to be safe from other inmates. [*Id*., ¶ 6].  She states that Clay specifically rejected the offer and stated he did not feel he needed protective custody. [*Id*.].

McKnight alleges that she explained to Clay what he needed to do if he felt that he needed protective custody, again reiterating to him that he should inform any staff member if he felt he was in danger and needed custody [*Id*]  Specifically, she gave him information about a special SIS phone line for cooperating inmates.  According to McKnight, Clay indicated that he understood how to use that information.  McKnight proceeded to submit a request for a body recorder to the Office of Internal Affairs in Washington, D.C. [*Id*, ¶ 8].

McKnight states that on February 10, 2003, Clay called her and asked her if she had heard anything from the FBI agent [*Id*., ¶ 9].  McKnight notes in her Declaration that although Clay indicated that he and Grundy were "having arguments about their illicit activities," Clay did not voice any fear of harm from Grundy. [*Id*]  McKnight again reminded him of the procedures in place through which to ask for help or protection [*Id*]

McKnight states that on February 17, 2003, she received a call from the FBI agent who

stated he did not want to place a body recorder on Clay, but preferred instead to initiate a plan in which Grundy could be recorded during a phone call. [*Id*., ¶ 10]. The proposed plan would also involve Clay's wife. [*Id*.].  McKnight communicated this to Clay by phone on February 24, 2003. Clay responded that he wanted to discuss the plan with his wife, but that he did not want to enter protective custody because he was afraid it would limit his visitations with his family [*Id*, ¶ 11]. McKnight again reiterated that Clay did not voice any fear of harm from Grundy [*Id*.].

McKnight states that time passed without any contact from Clay [*Id*., ¶ 12].  When SIS Lieutenant Howell later saw Clay in the corridor during a meal. At that time, Clay gave Briggs several reasons for not having contacted the SIS office [*Id*., ¶ 13].  McKnight  spoke with Clay and said his wife needed to contact the FBI agent as soon as possible  [*Id*.]. Clay said he was still having arguments with Grundy, but according to McKnight, Clay did not voice any fears of violence or indicate any desire for protective custody. [*Id*.].

McKnight states that this was the last conversation she had with Clay until the March 21, 2003 stabbing incident in the food service department at FCI-Manchester. [*Id*., ¶14].  After the stabbing incident, Grundy was removed immediately from the institution. [*Id*.]. Clay was taken to the hospital and treated for a shallow puncture wound to his chest, and then returned to FCI Manchester the same day and placed in the Special Housing Unit ("SHU"). [*Id*.].  Clay was then transferred to the Federal Correctional Institution in Ashland, Kentucky [*Id*.].

McKnight declares that during the entire period of time the SIS department interacted with Clay, staff fully complied with all policies and procedures for inmate informants. [*Id* McKnight, ¶ 16].  She states that if any staff member ever reasonably believed Clay was in danger from Grundy or fellow inmates, they would have immediately removed Clay from the

compound and placed him in the SHU in protective custody status, and then transferred to
another institution. [*Id*.]

McKnight states that FCI-Manchester staff and the FBI agent involved with the Grundy
investigation did not reasonably believe Clay was ever in any danger from Grundy. [*Id*., ¶17].
She explains that "staff-on-inmate" assaults are rare, especially an assault of the nature which
occurred on March 21, 2003, in prison food service. [*Id*.].

The United States bases its argument, that it could not anticipate Grundy's assault on the
plaintiff, on McKnight's declarations that Clay never voiced or otherwise expressed any fears of
harm from Grundy to anyone in SIS. [*Id*., ¶18]. The only fears he expressed was harm from
fellow inmates because he was cooperating with law enforcement. [*Id*.].

McKnight maintains in her statement that although Clay had many methods of
communicating his fears of Grundy to staff and protecting himself if he felt threatened, he never
utilized any of these methods, which included the SIS phone line, written and spoken
communication to SIS or any other staff member, or outside entities. [*Id*., ¶ 19].  She further
notes that during the relevant time period, Clay never requested a transfer from food service to
another work assignment. [*Id*., ¶ 20].   She states that he never requested a transfer to another
institution or gave any indication he did not want to be in the vicinity of Grundy. [*Id*.]. Instead,
he continued to work in food service until Grundy stabbed Clay on March 21, 2003.

McKnight then described Grundy's and Clay's respective reputations.  While noting that
Grundy had a general reputation as an "odd staff member who had poor boundaries with inmates
and was known to inappropriately horseplay with them at work," she states that staff knew of no
history of Grundy ever threatening violence towards any inmates or exhibiting violence against

inmates or any individuals [*Id.*, ¶ 21].

She states that Clay was under investigation for drug introduction for much of the time he was at FCI-Manchester. [*Id.*,¶ 22]. Clay's name was well-known in the SIS department because of these investigations and his lengthy disciplinary record at FCI-Manchester, which included assault on another inmate, inappropriate touching of a visitor, phone abuse, and being absent from a work assignment, all committed within a six-month period of time. [*Id.*]. She describes Clay as an inmate with highly questionable veracity who often exaggerated to staff. [*Id.*] Based on these facts, SIS staff did not believe Clay was in any danger from Grundy after Clay alleged (and later backed off of this claim) he had "come to blows" with Grundy. [*Id.*, ¶ 24].

McKnight alleges that despite Clay's allegation to her of being involved in a physical altercation with Grundy before the stabbing, he eventually backed off of this claim during the same conversation with McKnight, and said he did not need protective custody. [*Id.*, ¶ 23]. She reiterated that Clay did not voice any apprehensions about continuing to work in food service and interacting with Grundy. [*Id.*].

McKnight states that while Clay was confined in  FCI-Manchester, he never made any allegations Grundy pointed a weapon at him while Clay was on the recreation yard. [*Id.*, ¶ 25]. She states that a review of Clay and Grundy's SIS records does not reveal any mention of this allegation. [*Id.*].  McKnight contends that if this had been reported as Clay alleges, the SIS department would have immediately investigated this serious allegation, but she states that no such SIS investigative file exists. [*Id.*].

### 3.  Timothy Briggs Declaration [Record No. 41-4]

As discussed in McKnight's Declaration, FBI agent Timothy Briggs met with Clay and

8

FCI-Manchester SIS Technician McKnight on or about January 28, 2003. [Briggs Decl, Record No, 41-2, ¶ 3]. Agent Briggs states that his dealings with Clay were part of preliminary investigations into Clay's allegations, and that Clay was never used as an undercover informant for a criminal investigation of Grundy. [*Id*., ¶ 7].

During the January 28, 2003 meeting, Clay repeated his allegations of drug dealing with Grundy, and other food service staff and FCI-Manchester inmates. [*Id*., ¶ 3]. Agent Briggs states that Clay said he was willing to wear a body recorder. [*Id*.]. Briggs states that at no time during this meeting does he recall Clay voice any fear of harm from Grundy. [*Id*., ¶ 4].

Agent Briggs eventually decided on a plan to record Grundy speaking about the drug deal on the phone to Clay's wife. [*Id*., ¶5]. However, in the end, Agent Briggs never received agreement from either Clay or his wife to be formally involved with an FBI investigation of Grundy. [*Id*., ¶¶ 6-7].

Briggs states that his understanding of Clay was that he (Clay) was comfortable interacting with Grundy and never claimed to be in danger from Grundy. [*Id.* ¶ 9]. Throughout his interactions with Clay and FCI-Manchester SIS staff, FBI Agent Briggs was not aware of Clay alleging that Grundy had pointed a weapon at him. [*Id*., ¶ 10]. Briggs states that such a serious allegation would have warranted immediate action. [*Id*.].

Briggs states that it was never substantiated whether Grundy ever engaged in any criminal conduct involving illegal drugs and FCI-Manchester inmates. After the stabbing incident, Clay was transferred and the preliminary investigation of Grundy ceased. [*Id*., ¶¶ 7-8].

#### 4. Kevin Walasinski Declaration [Record No. 41-5]

The United States submitted the sworn Declaration of Kevin Walasinski, Senior Attorney

9

at the BOP's Lexington Consolidated Legal Center.  Summarized, Mr. Walasinksi stated that the

BOP does not have any regulation,  policy or procedure which dictates any mandatory course of

action for the protection and safety of inmate informants and the use of inmate informants by the

BOP [Walasinski Decl., Record No. 41-5, ¶ 2].

He explained that the SIS department of the BOP has "complete discretion in determining

how to conduct informal or formal investigations involving the use of inmate informants." [*Id,*. ¶.

3].  Walasinski stated that, based on the specifics of a particular case, the SIS staff has complete

discretion to decide all matters pertaining to protection of inmates from other inmates or from

staff members [*Id*., ¶ 5].

Walasinski offered the following examples of the BOP's unfettered discretion in this area

as being: (1) whether to permit an inmate informant to continue his job duties; (2) whether to

keep that inmate in the prison's general population; (3) whether to place an inmate informant in

protective custody; and (3) whether to transfer him to another institution [*Id*., ¶ 4].

Walasinski explained that in Plaintiff Clay's situation, that the BOP was under no

mandatory duty at any time to place Clay in protective custody, transfer him, or otherwise keep

him separated from staff member Morris Grundy [*Id*., ¶ 5].   According to Walasinski, BOP staff

uses its expertise in order to assess each particular situation; render a judgment as to the most

appropriate course of action, and determine if an inmate informant should be separated from the

source of potential danger [*Id*., ¶ 6].   He concludes his Declaration by noting that prison

officials with correctional and law enforcement expertise are in the best position to make such

determinations [*Id*., ¶ 7].

CLAY'S RESPONSE TO UNITED STATES'
MOTION [Record No. 42]

As an initial matter, Clay argues that the United States is not entitled to summary judgment because it has refused to disclose discovery relevant to the factual issues in this case. Clay alleges that he had a series of conversations with various BOP employees regarding not only the initial matter of whether he would act as a confidential informant for the BOP in its investigation of Grundy, but also the fact that Grundy had displayed a propensity for violence against him on prior occasions [Record No. 42-2].

Clay alleges that the United States has taped recordings of these conversations in its possession which will contradict McKnight's Declaration. He claims that although he has requested the tapes during discovery, the United States refuses to release the tapes [*Id*].

As for the contents of McKnight's Declaration, Clay offers a vastly different version of the facts. Clay alleges that he first discussed Grundy's illegal drug activities with Lieutenant Greenfield. He alleges that he informed Greenfield that on a prior occasion, Grundy pointed a gun at Plaintiff [Record No. 42, p. 2].[4] Clay alleges that Greenfield made written notes of their conversation, which says the United States also refuses to provide.

Clay alleges that following his initial contact with Lt. Greenfield, he was interviewed on January 28, 2003 by SIS Technician McKnight, and that they discussed him acting as a confidential informant regarding Grundy [*Id.*]. Plaintiff vehemently contends that if the BOP were forced to disclose either the tape recordings of his meeting with McKnight or any written notes stemming from that meeting, the recordings and notes would verify that Plaintiff expressed

---

[4] Plaintiff further asserts that he also had a similar conversation with FBI Agent Timothy O'Leary [*Id*].

great fear about confidentially informing on Grundy.[5]   Clay contends that he told McKnight that Grundy had already pointed a rifle at him.

Clay next claims that the BOP contradicted itself in this court record.   He refers to the fact that in paragraph 13 of  his original complaint, he had alleged that four weeks prior to Grundy stabbing him, he informed federal officials that Grundy was transporting marijuana into the prison [*See* 10/27/05 Complaint, Record No. 1-1, p.3].   He further alleges that in the same complaint, at paragraph 14, Lieutenant Greenfield asked Clay if he would agree to talk to a woman in the SIS at FCI-Manchester, and that he (plaintiff) agreed [*Id*., pp. 3-4].   As Clay correctly notes in his Response to the Motion to Dismiss, the United States denied both of these allegations in its October 2, 2006 Answer [*See* Record No. 34, p.4]

Clay contends that in Tammy McKnight's sworn Declaration of March 14, 2007, she stated essentially the same facts concerning Clay's revelations about Grundy which he had alleged in paragraphs 13 and 14 of his original complaint.   Clay argues that because  the United States initially denied his version of material facts on October 2, 2006, then later adopted them in McKnight's Declaration, summary judgment in the government's favor is not warranted.

Plaintiff next argues that the BOP breached the duty of care which it owed to him–as a confidential informant–under 48 U.S.C. § 4042(b).  He argues that Greenfield, McKnight and Briggs knew that he (plaintiff) was in danger of physical harm at the hands of Morris Grundy, yet ignored their statutory duty to protect him from such known harm.  He further claims that BOP Program Statement 5270.07 specifically requires BOP employees to afford "protection status" to

---

[5] Plaintiff further complains that the BOP has also failed and refused to produce any written notes or records of his interviews with either Lt. Greenfield or FBI Agent Timothy O'Leary.

inmate informants [Record No. 42, p. 6]. Plaintiff alleges that the BOP's failure to place him in administrative detention was the proximate cause of his injury, given his prior disclosures about Grundy's prior acts of violence toward him [*Id*].

<u>UNITED STATES' REPLY [Record No. 44]</u>

The BOP disputes that the plaintiff timely and adequately conveyed a discovery request seeking the material to which he referred in his Response. The United States further asserted that in light of the various legal arguments raised in its Renewed Motion for Summary Judgment, it should not be required to disclose the notes and recordings demanded by the plaintiff.

<u>DISCUSSION</u>
1. <u>Standard of Review</u>

Here, the United States has renewed its request for the entry of summary judgment in their favor. Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmovant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 245 (6th Cir.), *cert. denied,* 522 U.S. 967 (1997).

In its consideration of a motion for summary judgment, the Supreme Court of the United States has further directed, a court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial; "metaphysical doubt" is insufficient. *Matsushita*, 475 U.S. at 587. "[T]he plain language of Rule 56(c) mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a party who fails

to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*,

477 U.S. 317, 322 (1986).

The significant question is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter

of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986). The moving party has

the burden of showing there is an absence of evidence to support a claim. *Celotex*, 477 U.S. at

324-25. After the moving party carries its burden, the non-moving party must go beyond the

pleadings to designate by affidavits, depositions, answers to interrogatories, and admissions on

file, specific facts showing that there is a genuine issue of material fact for trial. *Id.* If the non-

moving party completely fails to prove an essential element of his or her case, then all other facts

are rendered immaterial. *Id.* at 322-23.

## 2. The FTCA

The  FTCA applies to federal inmates' claims alleging personal injuries sustained while

incarcerated because of negligence of government employees, *United States v. Muniz*, 374 U.S.

150 (1963), and provides the exclusive remedy for tort actions against the federal government, its

agencies and employees. The FTCA makes the United States liable "in the same manner and to

the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *see*

*generally*, *Dolan v. United States Postal Serv.*, 126 S. Ct. 1252, 1256 (2006).

These waivers of sovereign immunity are subject to a number of exceptions, including the

discretionary-function exception ("DFE") codified in 28 U.S.C. § 2680(a). The DFE provides

14

that the United States has not consented to suit where the claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *See* § 2680(a).

Because the United States has not waived its sovereign immunity with respect to discretionary functions, courts lack subject matter jurisdiction over acts falling within the discretionary function exception. *Rosebush v. United States*, 119 F.3d 438, 440 (6th Cir.1997). If the DFE is applicable, the United States would be shielded from any liability under the FTCA. If the facts do not warrant application of the DFE, then the case goes forward.

In order to determine if the DFE is applicable, the Court must conduct a two-part test. The first prong of the test calls for a "determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment of choice." *Rosebush v. United States*, 119 F.3d at 441. If there is no controlling mandate, the Court must conclude that the conduct involves discretion and the first prong of the test is satisfied for applying the DFE.

The second prong of the test calls for the determination of whether the conduct was the type of conduct which the exception was designed to shield. *Id* at 443. "Congress wished to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy." *Id.* at 441 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S. Ct. 2755 (1984)). Therefore, "where there is room for policy judgment and decision, there is discretion of the sort protected by Section 2680 (a)." *Id.*

As the Supreme Court has explained in *United States v. Gaubert*, 499 U.S. 315, 322, 111

S. Ct. 1267 (1991), "The exception covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice,' . . .; and 'it is the nature of the conduct, rather than the status of the actor' that governs whether the exception applies."  (Internal citations omitted).

In the instant proceeding, the United States has invoked the DFE as a means to bar the Plaintiff's claim.  In support of its motion, the United States relies upon the decision of the United States Court of Appeals for the Sixth Circuit in *Montez v. United States*, 359 F.3d 392 (6th Cir. 2004), where the court determined that the DFE precluded a suit arising from an altercation between inmates housed in a federal prison.  The Court will apply the two-pronged DFE analysis to the facts of the instant case.

3.  Application of Discretionary Function Test to Facts:

A. Did the prison officials' decisions regarding Clay's safety involve an element of judgment or choice ?

The DFE will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. *Montez,* 359 F.3d at 395;  *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S. Ct. 1954 (1988) (holding that the DFE did not apply where the complaint alleged that the FDA failed to follow a prescribed course of conduct when approving a polio vaccine).

Plaintiff Clay correctly notes that under 18 U.S.C. § 4042, the BOP has a duty to exercise ordinary diligence to keep federal inmates safe and free from harm.  *United States v. Muniz*, 374 U.S. 150 (duty of care owed by the BOP to its inmates is established in 18 U.S.C. § 4042). Under the standard established in § 4042, correctional officials are expected to use ordinary care to protect prisoners from unreasonable risks, not to provide them with a risk free-environment.

16

*Fleishour v. United States*, 365 F.2d 126, 128-29 (7th Cir.), *cert. denied*, 385 U.S. 987 (1966); *see also Flechsig v. United States*, 786 F. Supp 646,649-50 (E. D. Ky. 1991), *aff'd*, 991 F.2d 300 (6th Cir. 1993) (BOP's duty under § 4042 is not absolute; its duty depends on the reasonableness under the circumstances); *Turner v. Miller*, 679 F. Supp. 441, 443 (M.D. Pa. 1987); *Artis v. Petrovsky*, 638 F. Supp. 51, 53 (W. D. Mo. 1986).

Plaintiff argues that the BOP breached its duty, under § 4042, to safeguard and protect him from harm such as that posed by BOP employee Morris Grundy. Plaintiff Clay contends that § 4042 mandated a course of action for prison officials to follow in making decisions about his safety vis-a-vis Morris Grundy. Specifically Clay argues that the BOP was required to place him in administrative segregation from the moment he informed them that Grundy had pointed a gun at him prior to the stabbing incident.

As discussed previously, BOP officials McKnight and Briggs deny that Clay ever conveyed to them information about Grundy having threatened or pointed a gun at him. They deny that Clay expressed any *other* possible concerns about his safety at the hands of Grundy.

The Court must reject Clay's argument that the prison officials' decisions regarding his safety was mandated by § 4042. His reliance on § 4042 is misplaced in light of *Montez,* which held that BOP decisions concerning prisoner safety issues do in fact involve judgment or choice.

In *Montez*, the Sixth Circuit explained that although § 4042 imposes a mandatory duty of care on the BOP to safeguard inmates, that duty is of a general nature, broadly requiring that the BOP "provide for the safekeeping" and "provide for the protection" of inmates. *Id*. at 396. The court qualified that conclusion by explaining that "BOP officials are given no guidance, and thus have discretion, in deciding how to accomplish these objectives." *Id*. at 397.

17

As the Sixth Circuit concluded in Montez, "In sum, the relevant statute and regulations allowed BOP officials to exercise judgment when making decisions regarding [the prisoner's] safety." *Id*. *Montez* held that neither 18 U.S.C. § 4042(a) nor 28 C.F.R. § 541.10 prescribe a course of action for prison officials to follow under the first prong of the *Gaubert* test. *See Montez*, 359 F.3d at 396-97.[6]

Under the Supreme Court's two-factor approach, the Court will now address the second inquiry of the DFE test.

B. Were the prison officials' decisions regarding Clay's safety of the kind that the DFE was meant to shield?

While the Court could attempt to reinvent an explanation of how to analyze the second prong of the DFE, the *Montez* decision aptly addresses issue.

"Where the relevant governmental policy allows discretion, the Supreme Court has explicitly stated what a plaintiff must do to survive a motion to dismiss:

When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they

---

[6] The *Montez* case relied heavily on a two previous decisions from other circuits. The first case was *Calderon v. United States*, 276 F.3d 947 (7th Cir. 1997). Calderon was attacked by his cellmate after he had reported to officers that his cellmate had threatened him. Calderon sued the United States under the FTCA, alleging that prison officials had negligently failed to separate him from his cellmate and to prevent the attack. *Id*. at 948-49. The Seventh Circuit held that the DFE (28 U.S.C. § 2680(a)) barred Calderon's claims against the United States.

The second case relied upon was *Cohen v. United States*, 151 F.3d 1338, 1343 (11th Cir. 1998), *cert. denied*, 526 U.S. 1130 (1999). Citing *Calderon*, the Eleventh Circuit ruled that Cohen's reliance on § 4042 [to overcome the DFE] was misplaced, noting that for such an "'argument to be effective, [the plaintiff] must have to demonstrate that § 4042 sets forth nondiscretionary actions which BOP personnel were required to undertake to protect [him].' Section 4042 does not set forth any required nondiscretionary actions." *Cohen*, at 1343 (citing *Calderon*, 123 F.3d at 950).

are susceptible to policy analysis."

*Montez*, 359 F.3d at 397.

As *Montez* further instructs, at this juncture the Court must evaluate whether Clay's complaint alleges facts sufficient to rebut the presumption that the decisions by BOP-SIS technician McKnight (and/or FBI Agent Briggs) regarding his safety were "of the kind that the discretionary function exception was designed to shield." *Id.*, (citing *Gaubert*, 499 U.S. at 322-23, 111 S. Ct. 1267 (the *Gaubert* presumption).  To do that, a summary of the facts in *Montez* is helpful.

In *Montez*, an inmate was found dead in the housing unit of the prison after being beaten to death with a fire extinguisher. *Id.* at 393-94.  The assault occurred in an unsupervised area and the prison officials were unaware of the assault until a corrections officer discovered the body. *Id.* at 394. The prisons officials, however, were aware that the deceased inmate had prior altercations with other inmates and they previously had placed the deceased inmate in protective lock-up. *Id.* Two other inmates later were convicted of the murder. *Id.*

The inmate's estate brought suit under the FTCA claiming that the  inmate's murder was the direct and proximate result of the negligence of the prison officials/employees.   The estate alleged that because the inmate had been in protective lock-up prior to the attack, employees/officials of the prison knew or should have known that the inmate was in imminent danger of likely injury of substantial certainty.  The estate argued that the defendants consciously and knowingly failed to afford the inmate reasonable protection.

The inmate's estate next alleged that prison officials placed the inmate in a facility that they "knew or reasonably should have known was so inadequate that the inmate could not be

19

adequately protected from the risk of assaults by fellow prisoners."  The inmate's estate argued that prison officials "were required to use ordinary care in determining whether a federal prisoner should be kept in a particular facility and in determining where within that particular facility the prisoner should be kept . . . ." *Id*.

In analyzing the claim, the Sixth Circuit rejected the plaintiff's contention that various federal statutes and regulations (18 U.S.C. § 4042(a) and 28 C.F.R. § 541.10) prescribed a course of action for BOP officials to follow under the first prong of the *Gaubert* test. *See id*. at 396-97. Turning to the second prong of the test, the court reasoned that "decisions by prison officials to ignore specific and immediate threats against inmates are less likely to be the type of decision that can be said to be grounded in the underlying policy of the [BOP], which requires prison officials to provide for the safekeeping and protection of inmates." *Id*. at 398.

The Court emphasized the presumption that "decisions by prison officials regarding and inmate's safety were 'of the kind that the discretionary function exemption was designed to shield,'" *Id*. at 397.   Addressing the plaintiff's next contention, the Court determined that the prison officials' prior decision to place the deceased in protective lock-up did not "demonstrate the existence of a specific and immediate threat against [the deceased]" and was "insufficient to rebut the presumption." *Id*.

The Court concluded that the plaintiff's bare allegations regarding the placement of the deceased in an unsafe facility were insufficient to rebut the presumption. *Id*. The *Montez* court found that the claim fell within the DFE and dismissed the complaint for failure to state a claim.

Judge Rogers issued an informative concurring opinion.  He expressed reservation over the majority's decision to focus to heavily on the adequacy and credibility (or lack thereof) of the

20

plaintiff's allegations that the BOP officials knew or should have known that the inmate who died was in danger yet failed to provide him reasonable protection.  He explained as follows:

> "With respect, the issue for discretionary function exception purposes is not whether there is sufficient support for the allegation, nor is the issue the specificity or immediacy of the threat.  **Instead, the relevant question is whether the ongoing determination of where Hearlson would be placed was the type of agency decision-making that takes broad agency policies into account. In short, the relevant inquiry is the nature of the decision-making process, not the nature of the threat**."

*Montez*, 359 F.3d at 399 [Rogers, concurring] (Emphasis Added).

Judge Roger's distinction is an important consideration in evaluating the instant proceeding.  Here, Plaintiff Clay claims that he warned McKnight that Grundy had previously threatened him and that she insisted that he (Clay) continue with his efforts to obtain incriminating evidence against BOP employee Grundy.  He claims that McKnight and Briggs ignored a specific threat to his safety by failing to remove him from Grundy's access.

McKnight and Briggs deny that Clay expressed to them his fears of Grundy and further maintain that Clay failed to notify the BOP about any concerns relating Grundy.  They maintain that Clay had many means, and opportunities, of conveying his concerns about Grundy to BOP and that he did not avail himself of any of those means.

On the issue of what the BOP may or may not have known about Grundy's propensity for violence, there is clearly a factual dispute between the plaintiff's version of the facts and the version advanced by federal officials McKnight and Briggs.  The plaintiff has also pointed out that McKnight and Briggs appear to have adopted certain facts in their statements which the United States had previously denied in its October 2, 2006 Answer to the original complaint.

In this case, however, the parties' differing version of some facts will not prevent the

entry of summary judgment in favor of the United States.  This is an FTCA proceeding.  Guided by Judge Rogers' concurring opinion in *Montez*, the relevant issue to consider here under the second prong of the *Gaubert* test is: was the decision as to where the BOP would place Clay (either a confidential informant, or a *would-be* confidential inmate informant) the type of agency decision-making that takes broad agency policies into account ? [7]

In this case, BOP Senior Attorney Kevin Walasinski's Declaration answers that question in the affirmative.  He explains in comprehensive manner that as a matter of agency policy, the BOP has complete and total discretion to evaluate all issues relating to the handling of inmate confidential informant matters, including but not limited to the propriety of keeping them in the general population, placing them in segregation, or transferring them.

Walasinski notes that because of their experience in the area of corrections and law enforcement, BOP officials are vested with broad discretionary decision-making powers concerning how confidential inmate informants should be handled.  He states that BOP officials are best suited to make decisions affecting inmate informants.  He asserts that in Clay's case, the BOP used its best judgment in deciding not to segregate Clay, remove him from exposure to Grundy, or to transfer him out of FCI-Manchester prior to March 21, 2003.

Kevin Walasinski's statement explains that the BOP's has complete discretion as to how to handle confidential informant concerns. In their respective Declarations, Tammy McKnight and Timothy Briggs explain that based on: (1)  their experience; (2) the BOP's discretionary

---

[7] The plaintiff raised factual disputes as to the nature, specificity or the immediacy of the threat against him. As Judge Rogers explained in his concurring opinion in *Montez*, the adequacy of the threat is not the issue in an FTCA case: the issue is whether the agency's decision was the type that took broad agency policies into account. Here, the evidence is that the BOP's decision was the type of decision which took into account broad agency policies regarding inmate informants.

powers to address these type of issues; and (3) the facts at play in Clay's case (all described in detail in their Declarations), they did *not* perceive a need either to place Clay in administrative segregation or to transfer him prior to March 21, 2003.

The Court determines that because the answer to both questions posed in the analysis of the DFE are "yes," the DFE applies in this case. The weight of the record establishes that the decisions which the plaintiff challenges in this FCTA action were the type of discretionary decision making which Congress intended to fall within the purview of the DFE, 28 U.S.C. § 2680(a). The Walasinski and McKnight Declarations substantiate that regarding issues relating to management of confidential inmate informants, prison administrators should be given wide-ranging deference in adopting and executing prison policies.

The FTCA confers jurisdiction upon the federal courts to hear a party's claim in limited circumstances. *Feyers v. United States*, 749 F.2d 1222, 1225 (6th Cir. 1984), *cert. denied*, 471 U.S. 1125(1985). If, however, any exception to the FTCA applies, including the DFE, the district court lacks jurisdiction. *See Id*. at 1225 ("If a case falls within the statutory exceptions of 28 U.S.C. § 2680, the court lacks subject matter jurisdiction); *Rich v. United States*, 119 F.3d 447, 450 (6th Cir. 1997); *Ashley v. United States*, 37 F. Supp.2d 1027, 1030 (W.D. Tenn. 1997).

Because the acts of which the plaintiff complains are protected by the DFE, this Court does not have subject matter jurisdiction over the plaintiff's FTCA claim. Accordingly, the complaint and amended complaint must be dismissed for failure to state a claim upon which relief can be granted. 28 U.S.C. § 1915(e)(2)(B)(ii). The plaintiff's request for discovery material contained in his Response to the Motion for Summary Judgment, [Record No. 42] is therefore denied as moot.

<u>CONCLUSION</u>

Accordingly **IT IS ORDERED** as follows

(1)     The "Renewed Motion for Summary Judgment" [Record No. 41], filed by the

defendant, the United States of America, is **GRANTED**.

(2)     The Complaint [Record No.1] and the Amended Complaint [Record No. 17]

are **DISMISSED WITH PREJUDICE**;

(3)     Judgment shall be entered contemporaneously with this Memorandum Opinion

and Order in favor of the United States of America.

Dated this 28th day of September, 2007.

**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**